UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BINYAMIN PINKUS, | ) | |
| | ) | |
| Plaintiff, | ) | 16 C 10858 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| SIRIUS XM RADIO, INC., | ) | |
| | ) | |
| Defendant/Third-Party Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| THE RESULTS COMPANIES LLC, CAREER | ) | |
| HORIZONS, INC. d/b/a TELESERVICES DIRECT, | ) | |
| and iPACESETTERS LLC, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Binyamin Pinkus alleges that Sirius XM Radio, Inc. violated the Telephone Consumer

Protection Act ("TCPA"), 47 U.S.C. § 227, by causing over one hundred calls to be placed to his

cell phone using an automated telephone dialing system ("ATDS" or "autodialer"), and also by

using prerecorded voice messages on those calls. Doc. 105. Sirius brought third-party claims

against several telemarketing service providers, Doc. 8, three of which remain in the case, Docs.

73, 103 (voluntarily dismissing two providers); Docs. 81-82 (reported at 255 F. Supp. 3d 747

(N.D. Ill. 2017)) (dismissing one provider for *forum non conveniens*). The case was partially

stayed for some time pending the D.C. Circuit's resolution of *ACA International v. FCC*, 885

F.3d 687 (D.C. Cir. 2018), which reviewed a 2015 Federal Communication Commission

("FCC") order addressing the features that equipment must have to qualify as an ATDS under

the TCPA. Doc. 73. After *ACA International* was issued, Pinkus was given leave to and did file

an amended complaint. Docs. 104, 105. Sirius now moves under Civil Rule 12(c) for partial judgment on the pleadings, contending that Pinkus has not alleged facts sufficient to make it plausible that an ATDS was used to make the calls he received. Doc. 108. The motion is granted.

## Background

As on a Rule 12(b)(6) motion, the court on a Rule 12(c) motion assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See St. John v. Cach, LLC*, 822 F.3d 388, 389 (7th Cir. 2016); *Adams v. City of Indianapolis*, 742 F.3d 720, 727-28 (7th Cir. 2014). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Pinkus's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted); *see also N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998). The facts are set forth as favorably to Pinkus as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth the facts at this stage, the court does not vouch for their accuracy. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384 (7th Cir. 2010).

### A.     Statutory and Regulatory Landscape

As relevant here, the TCPA prohibits "mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any [ATDS] … to any telephone number assigned to a … cellular telephone service … ." 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA defines an ATDS as "equipment which has the capacity—(A) to

store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id*. § 227(a)(1). The FCC has the authority to promulgate regulations implementing the TCPA. *See ACA Int'l*, 885 F.3d at 693. Regulations that the FCC promulgated in 1992 adopted, without elaboration, the statutory definition of ATDS. *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("1992 Order"), 7 FCC Rcd. 8752, 8792 App'x B (1992) (amending 47 C.F.R. § 64.1200).

New FCC regulations promulgated in 2003 interpreted the term ATDS to include a "predictive dialer," meaning "equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("2003 Order"), 18 FCC Rcd. 14014, 14091-93 ¶¶ 131-133 (2003). As the Commission explained, a predictive dialer consists of "hardware" that, "when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers." *Id*. at 14091 ¶ 131. Telemarketers using predictive dialing software "program the numbers to be called into the equipment, and the dialer calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call." *Ibid*. Thus, the Commission noted, "[t]he principal feature of predictive dialing software is a timing function, not number storage or generation." *Ibid*.

The 2003 Order observed that, "[i]n the past, telemarketers may have used dialing equipment to create and dial 10-digit telephone numbers arbitrarily." *Id*. at 14092 ¶ 132. The Commission came to believe, however, that "to exclude … equipment that use[s] predictive dialing software from the definition of [ATDS] simply because it relies on a given set of numbers"—rather than generating the numbers itself—"would lead to an unintended result." *Id*.

at 14092 ¶ 133. According to the Commission, Congress could not have intended for it to be "permissible" to make calls to "wireless numbers … when the dialing equipment is paired with predictive dialing software and a database of numbers, but prohibited when the equipment operates independently of such lists and software packages." *Ibid*.

To support its position, the FCC stated that the TCPA's definition of ATDS "contemplates autodialing equipment that *either* stores *or* produces numbers," and also that it encompasses all "equipment" with the "'*capacity* to store or produce telephone numbers.'" *Id*. at 14092 ¶ 132 (first two emphases added) (quoting 47 U.S.C. § 227(a)(1)). By enacting this broad definition of ATDS, the FCC added, "Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies." *Ibid*. As the FCC saw it, Congress's primary purpose in enacting the TPCA was "to alleviate a particular problem—an increasing number of automated and prerecorded calls to certain categories of numbers." *Id*. at 14092 ¶ 133. This purpose was significant, the FCC asserted, because "the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective" than the past practice of "us[ing] dialing equipment to create and dial 10-digit telephone numbers arbitrarily." *Id*. at 14092 ¶ 132. For these reasons, the FCC concluded that "a predictive dialer falls within the meaning and statutory definition of [ATDS] and the intent of Congress." *Id*. at 14093 ¶ 133.

Five years later, in 2008, the FCC affirmed the 2003 Order in this respect. *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("2008 Declaratory Ruling"), 23 FCC Rcd. 559, 566 ¶ 12 (2008). The Commission noted that the 2003 Order "found that, based on the statutory definition of [ATDS], the TCPA's legislative history, and current industry practice and technology, a predictive dialer falls within the meaning and

definition of autodialer and the intent of Congress." *Id.* at 566 ¶ 13. Although a party to the 2008 proceeding urged the FCC to find that a "predictive dialer meets the definition of autodialer *only* when it randomly or sequentially generates telephone numbers, not when it dials numbers from customer telephone lists," *id.* at 566 ¶ 12 (emphasis added), the Commission disagreed, stating that nothing presented by the party "warrant[ed] reconsideration of [the 2003] findings." *Id.* at 567 ¶ 14.

The FCC in 2015 again reaffirmed the 2003 Order's ruling "that predictive dialers, as previously described by the Commission, satisfy the TCPA's definition of 'autodialer.'" *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("2015 Declaratory Ruling"), 30 FCC Rcd. 7961, 7972 ¶ 10 (2015). The reason, the Commission stated, was that it found "troubling that predictive dialers, like dialers that utilize random or sequential numbers instead of a list of numbers, retain the capacity to dial thousands of numbers in a short period of time." *Id.* at 7973 ¶ 14. According to the Commission, the TCPA's "unqualified use of the term 'capacity,'" which encompasses "equipment that lacks the 'present ability' to dial randomly or sequentially" but that can be configured to do so, necessarily means that the definition of an ATDS covers *all* predictive dialers, even those that simply dial numbers from customer telephone lists without randomly or sequentially generating the numbers. *Id.* at 7974 ¶ 15; *see also id.* at 7971-72 ¶ 10; *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 15391, 15392 ¶ 2 n.5 (2012) ("The Commission has emphasized that [the] definition [of ATDS] covers any equipment that has the specified capacity to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists.").

### B.      Pinkus's Allegations

Pinkus claims that Sirius violated the TCPA by, among other things, by causing over one hundred calls to be placed to his cell phone using an ATDS.  Doc. 105 at ¶¶ 9-23.  He alleges that the calls were placed "using 'predictive dialing' technology, which automatically places calls without human intervention until the called party answers the call, at which time such automatic dialer attempts to connect the called party."  *Id*. at ¶ 18; *see also id*. at ¶ 19 (alleging further that no customer service representative was on the line when he answered the calls, and that he would experience a delay after answering until a representative began speaking).  As Pinkus acknowledged at the hearing on this motion, Doc. 125, this claim rests on the premise that, as the FCC ruled in the 2003 Order and reaffirmed in the 2008 and 2015 Declaratory Rulings, a predictive dialer qualifies as an ATDS under the TCPA even if it lacks the capacity to generate randomly or sequentially telephone numbers to be dialed.

### Discussion

As discussed in detail below, *ACA International* invalidated the 2015 Declaratory Ruling's interpretation of the statutory term ATDS.  Sirius contends that, in so doing, *ACA International* necessarily invalidated the FCC's materially identical interpretation of the term ATDS in the 2003 Order and the 2008 Declaratory Ruling, and therefore that this court must interpret the term as an original matter without regard to the Commission's findings in all three rulemakings that predictive dialers categorically qualify as ATDSs.  Doc. 109 at 12-13.  That exercise, Sirius submits, results in the conclusion that only a predictive dialer with the capacity to "generate and [then] dial random or sequential telephone numbers," *id*. at 14-15—and not the kind of predictive dialers that the complaint alleges were used to call Pinkus, which have only the more limited capacity to dial numbers from customer telephone lists—qualifies as an ATDS.

Pinkus, by contrast, contends that *ACA International* left undisturbed the 2003 Order and 2008 Declaratory Ruling, and therefore that it remains the law that *all* predictive dialers qualify as ATDSs.  Doc. 114 at 19-20.

Under the Hobbs Act, "[t]he court of appeals … has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of all final orders of the [FCC]." 28 U.S.C. § 2342(1); *see also* 47 U.S.C. § 402(a) (making § 2342(1) applicable to FCC regulations promulgated under the TCPA).  There is no dispute here that the 2003 Order, the 2008 Declaratory Ruling, and the 2015 Declaratory Ruling are final orders within the meaning of § 2342(1), and thus that "absent a direct appeal," district courts "are bound to follow [them]." *Blow v. Bijora*, 855 F.3d 793, 802 (7th Cir. 2017) (citing *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 448-50 (7th Cir. 2010)).

*ACA International* consolidated several Hobbs Act petitions for review of the 2015 Declaratory Ruling.  *See ACA Int'l v. FCC*, No. 15-1211 (D.C. Cir.), Dkt. 07/24/2015 (consolidating petitions); *Prof'l Assoc. for Customer Engagement, Inc. v. FCC*, No. 15-2489 (7th Cir.), Dkt. 7 (transferring case); *see also Herrick v. GoDaddy.com LLC*, 2018 WL 2229131, at *5 n.5 (D. Ariz. May 14, 2018) (summarizing the procedural posture).  The parties do not dispute that this court is bound by *ACA International*, Doc. 109 at 13; Doc. 114 at 18; Doc. 119 at 6-7, as "that court became the 'sole forum for addressing … the validity of the FCC's rule[],'" *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 467 (6th Cir. 2017) (alterations in original) (quoting *Peck v. Cingular Wireless, LLC*, 535 F.3d 1053, 1057 (9th Cir. 2008)), once the Judicial Panel on Multidistrict Litigation assigned the petitions to the D.C. Circuit under 28 U.S.C. § 2112(a)(3), *see ACA Int'l v. FCC*, No. 15-1211 (D.C. Cir.), Dkt. 07/24/2015.  *See CE Design*, 606 F.3d at 450 (observing that granting the court of appeals

exclusive jurisdiction to review FCC rules "serves a number of valid goals: It promotes judicial efficiency, vests an appellate panel rather than a single district judge with the power of agency review, and allows uniform nationwide interpretation of the federal statute by the centralized expert agency created by Congress to enforce the TCPA") (internal quotation marks omitted); *GTE S., Inc. v. Morrison*, 199 F.3d 733, 743 (4th Cir. 1999) (similar).

Accordingly, the court must first assess *ACA International*'s scope. For the reasons stated below, *ACA International* invalidated not only the 2015 Declaratory Ruling's interpretation of the statutory term ATDS, but also the 2008 Declaratory Ruling's and 2003 Order's interpretation of that term. It follows that this court must interpret the term as an original matter and decide whether it encompasses the predictive dialers that Pinkus alleges were used to place the calls to his cell phone. For the reasons stated below, it does not.

## I.    *ACA International*'s Scope

The D.C. Circuit in *ACA International* reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), the FCC's interpretation in the 2015 Declaratory Ruling of the statutory term ATDS. 885 F.3d at 700, 703. At the outset of its analysis, the court observed that the TCPA's definition of ATDS—"equipment which has the capacity … to store or produce telephone numbers to be called, using a random or sequential number generator … and … to dial such numbers," 47 U.S.C. § 227(a)(1)—"naturally raises two questions: (i) when does a device have the 'capacity' to perform the two enumerated functions; and (ii) what precisely are those functions?" 885 F.3d at 695.

As to the first question, *ACA International* rejected the FCC's "expansive interpretation" of the term "capacity." 885 F.3d at 696. Observing with disapproval that the 2015 Declaratory Ruling had "the apparent effect of" deeming "any and all smartphones" to be ATDSs, the court

held that the FCC's interpretation gave "the statute's restrictions on auto-dialer calls … an eye-popping sweep." *Id*. at 696-97. The fundamental problem, the court explained, was that the Commission's "ruling states that equipment's 'functional capacity' includes 'features that can be added … through software changes or updates.'" *Id*. at 696 (ellipses in original) (quoting 30 FCC Rcd. at 7974 ¶ 16). The consequence of that reading—that "all smartphones … meet the statutory definition of an autodialer"—was unacceptable because it risked turning every call made or text sent from a smartphone "without advance consent" into a violation of federal law. *Id*. at 697.

As for the second and, for purposes of this suit, more crucial question, the D.C. Circuit rejected the FCC's understanding of the functions that equipment must have to qualify as an ATDS. Specifically, the D.C. Circuit overturned the FCC's decision in the 2015 Declaratory Ruling to "reaffirm[] … the notion that a device can be considered an autodialer even if it has no capacity itself to generate random or sequential numbers (and instead can only dial from an externally supplied set of numbers)." *Id*. at 702; *see* 2015 Declaratory Ruling, 30 FCC Rcd. at 7971-72 ¶ 10 ("We reaffirm our previous statements that dialing equipment generally has the capacity to store or produce, and dial random or sequential numbers (and thus meets the TCPA's definition of 'autodialer') even if it is not presently used for that purpose, *including when the caller is calling a set list of consumers*.") (emphasis added). The court did so, not because it affirmatively concluded that the FCC's understanding of ATDSs was wrong, but rather due to fatal inconsistencies in the FCC's reasoning.

As the court explained, the 2015 Declaratory Ruling at certain points appeared to require that, to qualify as an ATDS, a device must be able to "*generate* and then dial 'random or sequential numbers.'" *ACA Int'l*, 885 F.3d at 702 (quoting 30 FCC Rcd. at 7972 ¶ 10). That

requirement, the court noted, was implicit in the FCC's distinction "between use of equipment to 'dial random or sequential numbers' and use of equipment to 'call[] a set list of consumers.'" *Ibid*. (alteration in original) (quoting 30 FCC Rcd. at 7972 ¶ 10). "Anytime phone numbers are dialed from a set list," the court added, "the database of numbers must be called in *some* order—either in a random or some other sequence. As a result, the ruling's reference to 'dialing random or sequential numbers' cannot simply mean dialing from a set list of numbers in random or other sequential order." *Ibid*. If the FCC intended the reference to "dialing random or sequential numbers" to mean that, the court observed, there would have been no reason for the agency to distinguish "'dialing random or sequential numbers'" and "'dialing a set list of numbers'" as distinct activities. *Ibid.* (quoting 30 FCC Rcd. at 7973 ¶¶ 13, 14). "It follows," the court concluded, that the 2015 Declaratory Ruling's "reference to 'dialing random or sequential numbers' means generating those numbers and then dialing them." *Ibid*.

At the same time, the D.C. Circuit observed that the 2015 Declaratory Ruling at other points "suggest[ed] a competing view: that equipment can meet the statutory definition even if it lacks [the] capacity" to generate and then dial random or sequential numbers. *Ibid*. In support, the court pointed specifically to the FCC's decision to "reaffirm[] its 2003 ruling insofar as that order had found predictive dialers to qualify as ATDSs." *Ibid*. In the 2003 Order, *ACA International* explained, "the Commission had made clear that, while some predictive dialers cannot be programmed to generate random or sequential phone numbers, they still satisfy the statutory definition of an ATDS." *Ibid*. Thus, "[b]y reaffirming that conclusion in its 2015 ruling, the Commission supported the notion that a device can be considered an autodialer even if it has no capacity itself to generate random or sequential numbers (and instead can only dial from an externally supplied set of numbers)." *Ibid*.

Given the 2015 Declaratory Ruling's dissonant understandings of ATDS—one providing that "a device qualif[ies] as an ATDS only if it can generate random or sequential numbers to be dialed," and the other that "it [can] so qualify even if it lacks that capacity"—*ACA International* held that the Commission's "lack of clarity about which functions qualify a device as an autodialer" rendered unreasonable its ruling that predictive dialers categorically qualify as ATDSs. *Id.* at 702-03. Although "[i]t might be permissible for the Commission to adopt either interpretation" of the term ATDS, the D.C. Circuit observed, "the Commission [could not], consistent with reasoned decisionmaking, espouse both competing interpretations in the same order." *Id.* at 703.

The key question here is whether the *ACA International* invalidated only the 2015 Declaratory Ruling's understanding of ATDS, as Pinkus contends, or also the understanding set forth in the 2003 Order and 2008 Declaratory Ruling, as Sirius contends. As a formal matter, *ACA International* addressed only the 2015 Declaratory Ruling, as the deadline for challenging the 2003 Order and 2008 Declaratory Ruling had long passed by the time the petition for review in *ACA International* was filed. *See id.* at 702-03 (referencing only the "2015 ruling" in holding that the FCC had given "no clear answer" to the question whether "a device [can] qualify as an ATDS only if it can generate random or sequential numbers to be dialed"). It is for that reason that most district courts considering the question have held that *ACA International* vacated only the 2015 Declaratory Ruling—and therefore that courts remain bound by the FCC's rulings in the 2003 Order and 2008 Declaratory Ruling that a predictive dialer need not have the capacity to "generate random or sequential numbers to be dialed," *ACA Int'l*, 885 F.3d at 702, to qualify as an ATDS. *See Pieterson v. Wells Fargo Bank, N.A.*, 2018 WL 3241069, at *3 (N.D. Cal. July 2, 2018) ("*ACA Int'l* vacated the 2015 Declaratory Ruling but it did not clearly intend to disturb

the FCC's 2003 and 2008 orders."); *Ammons v. Ally Fin., Inc.*, __ F. Supp. 3d __, 2018 WL 3134619, at *6 (M.D. Tenn. June 27, 2018) ("In the wake of *ACA International*, this Court joins the growing number of other courts that continue to rely on the interpretation of § 227(a)(1) set forth in prior FCC rulings."); *McMillion v. Rash Curtis & Assocs.*, 2018 WL 3023449, at *3 (N.D. Cal. June 18, 2018) ("*ACA International* invalidated only the 2015 FCC Order—the court discusses but does not rule on the validity of the 2003 FCC Order or the 2008 FCC Order."); *Maddox v. CBE Grp., Inc.*, 2018 WL 2327037, at *4 (N.D. Ga. May 22, 2018) ("Given the *ACA Int'l* decision, the Court relies on the FCC's 2003 interpretation of § 227(a)(1) to determine if Defendant's system qualifies as an ATDS."); *Swaney v. Regions Bank*, 2018 WL 2316452, at *1 (N.D. Ala. May 22, 2018) ("In *ACA International*, the D.C. Circuit invalidated certain portions of the 2015 FCC Order, but not the portion of the Order reaffirming the FCC's 2003 determination that, 'while some predictive dialers cannot be programmed to generate random or sequential phone numbers, they still satisfy the statutory definition of an ATDS.'") (quoting *ACA Int'l*, 885 F.3d at 702); *Reyes v. BCA Fin. Servs., Inc.*, __ F. Supp. 3d __, 2018 WL 2220417, at *11 (S.D. Fla. May 14, 2018) ("[N]owhere in the D.C. Circuit's opinion are the prior FCC orders overruled. Indeed, that would have been impossible given that the time to appeal those orders had long passed.").

This court respectfully takes a different view, holding that *ACA International* necessarily invalidated the 2003 Order and 2008 Declaratory Ruling insofar as they provide, as did the 2015 Declaratory Ruling, that a predictive dialer qualifies as an ATDS even if it does not have the capacity to generate phone numbers randomly or sequentially and then to dial them. As *ACA International* points out, the 2003 Order "observed that, '[i]n the past, telemarketers may have used dialing equipment to *create and dial* 10-digit telephone numbers arbitrarily,'" but that "the

industry had 'progressed to the point where' it had become 'far more cost effective' instead to 'us[e] lists of numbers.'"  885 F.3d at 702 (alterations in original) (quoting 18 FCC Rcd. at 14092 ¶ 132).  Even in 2003, the D.C. Circuit noted, the Commission "suggested it saw a difference between calling from a list of numbers, on one hand, and 'creating and dialing' a random or arbitrary list of numbers, on the other hand."  *Ibid*.; *see* 2003 Order, 18 FCC Rcd. at 14091 ¶ 131 (noting that a "predictive dialer" consists of "hardware" that, "when paired with certain software, has the capacity to store or produce numbers and dial those numbers *at random, in sequential order, or from a database of numbers*") (emphasis added); *ibid.* (noting that "[t]he principal feature of predictive dialing software is a timing function, not number storage or generation").  But, the D.C. Circuit observed, the 2003 Order—just like the 2015 Declaratory Ruling—elsewhere "made clear that, while some predictive dialers cannot be programmed to generate random or sequential phone numbers, they still satisfy the statutory definition of an ATDS."  885 F.3d at 702 (citing 18 FCC Rcd. at 14091 ¶ 131 n.432, 14093 ¶ 133).

*ACA International*'s concern that the FCC in the 2015 Declaratory Ruling "fail[ed] to satisfy the requirement of reasoned decisionmaking" due to the agency's "lack of clarity about which functions qualify a device as an autodialer" thus applies with equal force to the 2003 Order.  *Id*. at 703.  That same concern applies as well to the 2008 Declaratory Ruling, which simply "affirm[ed]" the understanding of ATDS articulated in the 2003 Order.  2008 Declaratory Ruling, 23 FCC Rcd. at 566 ¶ 12; *see also id*. at 566-67 ¶ 14 ("ACA raises no new information about predictive dialers that warrants reconsideration of [the 2003 Order's] findings.").  It necessarily follows that *ACA International* invalidates not only the 2015 Declaratory Ruling's understanding that all predictive dialers qualify as ATDSs, but also the 2003 Order and 2008 Declaratory Ruling to the extent they express the same understanding.  *See Sessions v. Barclays*

*Bank Del.*, __ F. Supp. 3d __, 2018 WL 3134439, at *4 (N.D. Ga. June 25, 2018) ("Contrary to the pronouncement of the *Reyes* court, the D.C. Circuit clearly held that it invalidated *all* of the FCC's pronouncements as to the definition of 'capacity' as well as its descriptions of the statutory functions necessary to be an ATDS."); *Herrick*, 2018 WL 2229131, at *7 (same).

Though no confirmation is necessary, the point is confirmed by another aspect of *ACA International*. In defending the 2015 Declaratory Ruling before the D.C. Circuit, the FCC argued as a "threshold matter" that the court did not have "jurisdiction to entertain petitioners' challenge concerning the functions a device must be able to perform" to qualify as an ATDS. *ACA Int'l*, 885 F.3d at 701. The reason given by the FCC was "that the issue [had been] resolved in prior agency orders," namely the 2003 Order and the 2008 Declaratory Ruling: "According to the Commission, because there was no timely appeal from those previous orders, it [was] too late now to raise a challenge by seeking review of a more recent declaratory ruling that essentially ratifies the previous ones." *Ibid.* *ACA International* rejected that argument, holding that it was not barred from reviewing the FCC's "pertinent pronouncements" given that the FCC's "prior rulings left significant uncertainty about the precise functions an autodialer must have the capacity to perform." *Ibid.*

Pinkus's submission that the D.C. Circuit invalidated the 2015 Declaratory Ruling but left intact the 2003 Order and the 2008 Declaratory Ruling cannot be reconciled with this aspect of *ACA International*. As noted, the infirmity in the FCC's reasoning that *ACA International* identified in invalidating the 2015 Declaratory Ruling—that the agency reasoned at some points that a device qualifies as an ATDS only if it can generate random or sequential numbers to be dialed, and at other points that a device can so qualify even if it lacks that capacity—is equally present in the FCC's two earlier "pronouncements." *Ibid.* In rejecting the FCC's threshold

argument that this issue was off limits because it had been resolved in the 2003 Order and 2008 Declaratory Ruling, the D.C. Circuit necessarily determined that the 2015 Declaratory Ruling was inextricably intertwined with the 2003 Order and the 2008 Declaratory Ruling insofar as they, too, addressed the capacities a predictive dialer must have to qualify as an ATDS.

Accordingly, the court is not obligated under the Hobbs Act, as it would have been prior to *ACA International*, to conclude that *all* predictive dialers—regardless of whether they have the capacity to "*generate* and then dial random or sequential numbers," *ACA Int'l*, 885 F.3d at 702 (internal quotation marks omitted)—qualify as ATDSs simply because the FCC so held in TCPA rulemakings. *See Peck*, 535 F.3d at 1057 ("In the absence of an agency interpretation of the statute, we examine section 332(c)(3)(A) as we would any other statute.").

## II.     The Extent to Which Predictive Dialers Qualify as ATDSs under the TCPA

With the D.C. Circuit having invalidated the FCC's ruling that the statutory term ATDS includes all predictive dialers, this court must address the issue as an original matter and then decide whether Pinkus has alleged that the calls placed to him were made using an ATDS. *See Sessions*, 2018 WL 3134439, at *4 ("The Court now turns to whether Plaintiff sufficiently alleged that Defendant used an ATDS as defined by the TCPA."); *Herrick*, 2018 WL 2229131, at *7 (same).

Although it invalidated the FCC's rulings, *ACA International* did not itself articulate a definitive view of which functions characterize an ATDS. *See* 885 F.3d at 703 (noting that "[i]t might be permissible" for the FCC to conclude *either* that a device can "qualify as an ATDS only if it can generate random or sequential numbers to be dialed" *or* that it can "so qualify even if lacks that capacity"). Pinkus's sole argument on that issue is that a "predictive dialer" as the 2003 Order described it—"hardware" that, "when paired with certain software, has the capacity

to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers," 18 FCC Rcd. at 14091 ¶ 131—qualifies as an ATDS.  Doc. 114 at 6, 19-20, 26.  Given this, the parties' dispute can be reduced to the question whether a predictive dialing device that calls telephone numbers from a stored list of numbers—rather than having generated those numbers either randomly or sequentially—satisfies the statutory definition of ATDS.

"When interpreting a statute," the court "must begin with its text and assume that the ordinary meaning of that language accurately expresses the legislative purpose." *Our Country Home Enters., Inc. v. Comm'r*, 855 F.3d 773, 791 (7th Cir. 2017) (alteration and internal quotation marks omitted); *see also Coleman v. Labor & Indus. Review Comm'n of Wis.*, 860 F.3d 461, 473 (7th Cir. 2017) ("We give statutes their plain meaning … .").  Accordingly, the court begins with "'the language [of the statute] itself,'" attending to "'the specific context in which that language is used.'"  *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1077 (7th Cir. 2013) (brackets in original) (quoting *McNeill v. United States*, 563 U.S. 816, 819 (2011)).  The court must "accord words and phrases their ordinary meanings and avoid rendering them meaningless, redundant, or superfluous."  *Ibid.*

As noted, the TCPA defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  47 U.S.C. § 227(a)(1).  According to Pinkus, the placement of the adverbial phrase "using a random or sequential number generator" indicates that it modifies only the verb "produce" and not the verb "store."  Doc. 114 at 20-21.  On that reading, and given the disjunctive "or" separating "store" and "produce," a device's having the "capacity to produce telephone numbers to be called, using a random or sequential number generator" (and then to

dial those numbers) is only *one* possible way a device can qualify as an ATDS. *Id.* at 21. Another way is for the device to simply have the "capacity … to store and dial numbers." *Ibid.* Because any predictive dialer has the latter capacity—specifically, in Pinkus's view, the capacity to store numbers from a "pre-determined list," *id.* at 22—Pinkus argues that Sirius's Rule 12(c) motion must be denied because the operative complaint alleges that the devices that were used to call him were predictive dialers. Doc. 105 at ¶¶ 10, 18-19.

Pinkus's reading of the statute would be convincing if subsection (a)(1)(A) were rearranged to read: "to store or, *using a random or sequential number generator*, to produce telephone numbers to be called." Rearranging the text in that manner would make it clear that "using a random or sequential number generator" modified only "produce" and not "store." But it is an unconvincing reading of the statute that Congress in fact drafted, with the adverbial phrase following both verbs. Understanding why requires some explanation.

Like "produce," "store" is a transitive verb, and so requires an object. *See Merriam-Webster* (2018), https://www.merriam-webster.com/dictionary/store; *Oxford English Dictionary* (2018), http://www.oed.com/view/Entry/190929?rskey=pdyROA&result=2#eid. And the object of the verbs "store" and "produce" is "telephone numbers to be called." As a result, despite the disjunctive "or" linking "store" and "produce," "store" is not a grammatical orphan, rather, like "produce," it is tied to the object, "telephone numbers to be called." The TCPA thus defines as an ATDS a device that has the capacity "[1] to store or produce [2] telephone numbers to be called" and then "to dial such numbers." 47 U.S.C. § 227(a)(1).

But what kinds of numbers? Given its placement immediately after "telephone numbers to be called," the phrase "using a random or sequential number generator" is best read to modify "telephone numbers to be called," describing a quality of the numbers an ATDS must have the

capacity to store or produce.  Had Congress meant "using a random or sequential number generator" to modify the verbs "store" and "produce," Congress would have placed the phrase immediately after those verbs and before "telephone numbers to be called"—with subsection (a)(1)(A) reading, "to store or produce, *using a random or sequential number generator*, telephone numbers to be called."  Indeed, it would be odd to read the phrase "using a random or sequential number generator" as modifying "store" and "produce."  The comma separating "using a random or sequential number generator" from the rest of subsection (a)(1)(A) makes it grammatically unlikely that the phrase modifies only "produce" and not "store," *see Yang v. Majestic Blue Fisheries, LLC*, 876 F.3d 996, 1000 (9th Cir. 2017) ("[B]oth we and our sister circuits have recognized the punctuation canon, under which a qualifying phrase is supposed to apply to all antecedents instead of only to the immediately preceding one where the phrase is separated from the antecedents by a comma.") (brackets and internal quotation marks omitted) (citing decisions from the Second, Third, Eleventh, and Federal Circuits), and yet it is hard to see how a number generator could be used to "store" telephone numbers.

Because the phrase "using a random or sequential number generator" refers to the kinds of "telephone numbers to be called" that an ATDS must have the capacity to store or produce, it follows that that phrase is best understood to describe the process by which those numbers are generated in the first place.  True, the statute does not use the verb "generate."  But the phrase "using a random or sequential number generator" indicates that a number generator must be used to do *something* relevant to the "telephone numbers to be called"—most naturally, either to generate the numbers themselves, or to generate the order in which they will be called.

The latter possibility is highly unlikely for at least two reasons.  For one, as *ACA International* recognized, numbers must necessarily "be called in *some* order—either in a

random or some other sequence." 885 F.3d at 702. As a result, were the phrase "using a random or sequential number generator" understood to refer to how numbers are called rather than to how they are generated, it would be superfluous, as it would simply encompass the universe of possible orders in which numbers could be dialed. For another, if "using a random or sequential number generator" referred to the order in which numbers are dialed and not the process of generating them, the phrase would have followed, rather than preceded, "dial such numbers" in section (a)(1)(B). That is, the statute would have read: "to store or produce telephone numbers to be called; and to dial such numbers, *using a random or sequential number generator*"—which it does not.

So, the phrase "using a random or sequential number generator" necessarily conveys that an ATDS must have the capacity to generate telephone phone numbers, either randomly or sequentially, and then to dial those numbers. *See Dominguez v. Yahoo, Inc.*, 629 F. App'x 369, 372 (3d Cir. 2015) (holding that "'random or sequential' number generation … refers to the numbers themselves rather than the manner in which they are dialed"). This interpretation finds support in the FCC's pre-2003 understanding of the statutory term ATDS. The 1992 Order expressed the view that "[t]he prohibitions of § 227(b)(1)"—which, as noted, make it unlawful to use an ATDS under certain conditions—"clearly do not apply to functions like 'speed dialing,' 'call forwarding,' or public telephone delayed message services (PTDMS), because the numbers called are not generated in a random or sequential fashion." 7 FCC Rcd. 8752, 8776 ¶ 47. And in a follow-on 1995 ruling, the Commission described "calls dialed to numbers generated randomly or in sequence" as "autodialed." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12400 ¶ 19 (1995). The FCC's pre-2003 understanding of § 227(a)(1) thus reinforces what its plain text shows—that equipment qualifies

as an ATDS only if it has the capacity to "function … by generating random or sequential telephone numbers and dialing those numbers." *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 121 (3d Cir. 2018).

Pinkus's other arguments fail to persuade. He contends that if subsection (a)(1) excludes from its ambit predictive dialers that do not have the capacity to generate numbers randomly or sequentially, "it would be impossible for any caller to have a meaningful consent policy," as the statute requires. Doc. 114 at 24. The reason, he contends, is that a marketer using an ATDS could never know in advance whether any given number generated by the equipment and then dialed was linked to a cellphone user who had not given consent to receive calls. *Ibid*. Pinkus similarly contends that the TCPA provision allowing for treble damages in the event of a "willful violation," 47 U.S.C. § 227(b)(3), would be rendered inoperative if subsection (a)(1) excluded predictive dialers because prospective defendants relying on the whims of the ATDS's number-generating capacity could never know that they were undertaking prohibited conduct until they had actually done so. Doc. 114 at 25-26. But Pinkus's hypothetical is unnecessarily wooden, as it is possible to imagine a device that both has the capacity to generate numbers randomly or sequentially and can be programmed to avoid dialing certain numbers, including numbers that belong to customers who have not consented to receive calls from a particular marketer. Whether a marketer has violated the TCPA thus need not be a matter of coincidence; rather, violations would result from a marketer's failure (deliberate or otherwise) to program the device correctly.

Pinkus next contends that the TCPA's exemption for calls made to collect government debt, *see* 47 U.S.C. § 227(b)(1)(A)(iii), would be nonsensical if subsection (a)(1) excluded predictive dialers, because debt collectors target particular numbers they believe are likely to

belong to debtors who owe the federal government, rather than generate and call phone numbers at random. Doc. 114 at 25. That may well be true. But it does not change the fact that the best reading of 47 U.S.C. § 227(a)(1) requires that an ATDS have the capacity to generate numbers randomly or sequentially and then to dial them, even if that capacity is not deployed for practical reasons. And that defining characteristic of an ATDS defeats Pinkus's claim, for he concedes that his complaint does not plausibly allege that he was called with a device that has the capacity to store or produce numbers that have been randomly or sequentially generated. *See Dominguez*, 894 F.3d at 121 (granting summary judgment where the plaintiff could not "point to any evidence that … [the device at issue] had the present capacity to function as an autodialer by generating random or sequential telephone numbers and then dialing those numbers").

### Conclusion

Sirius's partial motion for judgment on the pleadings is granted. Pinkus's claim that Sirius caused him to be called with an ATDS is dismissed. Pinkus may proceed with his claim—which the motion does not address, Doc. 109 at 7 n.1—that Sirius violated the TCPA by causing him to be called using a prerecorded voice. Doc. 105 at ¶¶ 3, 10, 13, 23.

July 26, 2018

_____
                                    United States District Judge